## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**CHRISTOPHER CLARK CASSIDY,**

**Plaintiff,**

**vs.**                                             **CIVIL ACTION NO. 2:17-CV-03251**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

**Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered June 14, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Motion for Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 17 and 20.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings to the extent he seeks remand (Document No. 17.), **DENY** Defendant's request to affirm the decision of the Commissioner (Document No. 20.); **REVERSE** the final decision of the Commissioner; and **REMAND** this matter back to the Commissioner

pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings as explained *infra*.

**Procedural History**

The Plaintiff, Christopher Clark Cassidy (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on July 19, 2013, alleging disability since April 12, 2012, because of "[a]rthritis, rod and 4 screws and cage in lower back, back injury, herniated discs, bulging discs, permanent nerve damage, depression, and insomnia." (Tr. at 175-176, 198.) His claim was initially denied on March 24, 2014 (Tr. at 113-117.) and again upon reconsideration on June 12, 2014. (Tr. at 119-125.)

Claimant then filed a written request for a hearing on August 5, 2014. (Tr. at 126-127.) An administrative hearing was held on February 26, 2016 before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 45-71.) On May 2, 2016, the ALJ entered an unfavorable decision. (Tr. at 25-44.) On May 25, 2016, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 21-24.) The ALJ's decision became the final decision of the Commissioner on April 19, 2017 when the Appeals Council denied Claimant's Request.[1] (Tr. at 7-13.)

On June 13, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 17.), in response, the Commissioner filed a Brief in Support of Defendant's

---

[1] On August 2, 2017, the Appeals Council denied a request to reopen the case and change its decision denying Claimant's request for review. (Tr. at 1-2.)

Decision (Document No. 20.), and then Claimant filed his Reply. (Document No. 21.) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Throughout the underlying proceedings, Claimant is a "younger person", though the ALJ recognized that he subsequently changed age categories to a younger person aged 45-49 since the alleged onset date. See 20 C.F.R. § 404.1563(c). (Tr. at 37.) Claimant was previously awarded benefits for a closed period of disability from June 2009 to June 2010 during which he had spinal fusion surgery and afterwards, he returned to work full time without significant medical restrictions. (Tr. at 49, 72-82.) He had a consistent work history as a mechanic for heavy equipment and diesel engines. (Tr. at 67.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id.

§ 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).[2]

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2017. (Tr. at 30, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of April 12, 2012. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: residuals of lumbar spine fusion; degenerative disc disease of the cervical spine; obesity; and bilateral flatfoot deformities. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments

did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix

1. (Tr. at 33, Finding No. 4.)

> The ALJ then found that Claimant had the residual functional capacity ("RFC") to

> lift 10 pounds occasionally and less than 10 pounds frequently. The claimant can
> stand and walk 2 hours during an 8-hour day. He can sit at least 6 hours during an
> 8-hour day. The claimant can occasionally climb ramps and stairs. He can never
> climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop,
> kneel, crouch, and crawl. He can tolerate only occasional exposure to extreme
> temperatures, vibrations, and hazards.

(Tr. at 33-34, Finding No. 5.) At step four, the ALJ found Claimant was incapable of performing

his past relevant work. (Tr. at 37, Finding No. 6.) At the final step, the ALJ found that in addition

to the immateriality of the transferability of job skills, Claimant's age, education, work experience,

and RFC indicated that there were jobs that exist in significant numbers in the national economy

that Claimant could perform. (Tr. at 37-38, Finding Nos. 7-10.)

Finally, the ALJ determined Claimant had not been under a disability from April 12, 2012

through the date of the decision. (Tr. at 38, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ erred in two main areas: the first is that she failed to adhere

to the special deference standard or to the Regulations when evaluating the opinions of Claimant's

treating physicians, Dr. Rajesh Patel, an orthopedist, and Blake A. Weeks, DPM, a podiatrist.

(Document No. 17 at 9-11.) Specifically, the ALJ gave only partial weight to Dr. Patel's opinion,

and did not explain why she gave it credit to the extent it was consistent with a sedentary physical

demand level. (Id. at 11.) Further, the ALJ only gave Dr. Weeks's opinion little weight, without

adequate explanation or reference to the evidence of record. (Id. at 12.) Because the ALJ did not

provide any persuasive contrary evidence that supported her devaluation of the treating physicians'

opinions, and because she failed to give good reasons for same as required under the Regulations, her determination circumvents meaningful review, resulting in an unfavorable decision unsupported by substantial evidence. (Id. at 12-13.)

Next, Claimant asserts that the ALJ erred at step two when she found his degenerative joint disease of the knees a non-severe impairment, particularly when she kept the record open to receive additional medical evidence that showed Claimant had severe chondromalacia, which the ALJ failed to mention in her decision. (Id. at 13-14.) Claimant argues this is reversible error because the ALJ was unable to pose hypothetical questions to the vocational expert that adequately represented all of his functional limitations. (Id. at 14-15.)

Claimant contends that the ALJ's decision is not supported by substantial evidence and asks this Court remand this matter for the correction of errors made below. (Id. at 15.)

In response, the Commissioner argues that not only did the ALJ properly evaluate the opinions of Claimant's treating physicians, but also formulated an RFC that was consistent with the medical source opinion evidence. (Document No. 20 at 13.) The Commissioner states the ALJ gave the appropriate credit to Dr. Weeks's opinion pursuant to the Regulations, and points out that Claimant went more than a year without seeking podiatric treatment and did not seek treatment from Dr. Weeks until after he filed for disability benefits; he saw Claimant three times during the relevant period. (Id. at 15, 16.) Moreover, Claimant's treatment essentially consisted of custom orthotics. (Id. at 15.) The Commissioner also asserts that the ALJ gave the opinion provided by Dr. Weeks little weight because he did not give any objective findings for the limitations he assessed. (Id.) Further, other evidence in the record did not support Dr. Weeks's opinion, including treatment notes from Dr. Patel. (Id. at 16.)

With respect to Dr. Patel, the Commissioner contends that his opinion actually predated the alleged onset date, which would be of minimal relevance to the ALJ's RFC assessment, nevertheless, the ALJ's RFC assessment essentially adopts Dr. Patel's opinion by limiting Claimant to not lifting more than ten pounds occasionally, and to not walking or standing more than two hours during a workday. (Id. at 16-17.) In addition, the Commissioner argues that the ALJ posed a hypothetical question that was more restrictive than what Dr. Patel opined, and the vocational expert responded there was still work Claimant could perform. (Id. at 17-18.) Therefore, had the ALJ adopted those more restrictive limitations, the ultimate decision remains the same, making remand unnecessary. (Id. at 18.)

Significantly, the ALJ did not wholly adopt the opinions of the State agency medical consultants, but gave Claimant benefit of the doubt and included additional limitations in the RFC. (Id.) The Commissioner contends that Claimant seems to disagree with the ALJ's assessment and wants this Court to re-weigh the evidence to arrive at a different conclusion, however, the ALJ's determination is supported by substantial evidence. (Id. at 19.)

With regard to the ALJ's step two determination that Claimant's knee impairments were non-severe, the Commissioner asserts that the ALJ proceeded forward with the sequential evaluation process and considered the entire record concerning Claimant's symptoms from both his severe and non-severe impairments when she formulated the RFC. (Id. at 19-21.) Despite the most recent medical records, the February 2016 MRI indicating grade 3-4 chondromalacia in Claimant's right knee, the evidence did not demonstrate further functional loss related to this impairment than what the ALJ had already accommodated for in the RFC. (Id. at 21-22.) Regardless, the Commissioner contends the evidence did not show that Claimant's knee

impairments were severe because the evidence failed to indicate that they interfered significantly with his ability to do basic work activities. (Id. at 22.) Remand based solely on the ALJ's step two finding is inappropriate. (Id.)

The Commissioner asks that the final decision be affirmed. (Id. at 23.)

In reply, Claimant restates that the ALJ failed to properly evaluate his treating physicians' opinions and points out that the Commissioner's argument provides the *post hoc* rationale that the ALJ should have provided as factors for justifying the weight she assigned to their opinions, especially the opinion given by Dr. Weeks. (Document No. 21 at 1-2.) In addition, Claimant argues that the ALJ's RFC and Dr. Patel's opinion are not consistent, and the ALJ never did account for the limitations noted in Dr. Patel's opinion. (Id. at 2.) The ALJ misstated the vocational expert's testimony when formulating the RFC, which is reversible error given the fact Claimant was deemed capable of sedentary work. (Id. at 2-3.) In short, Claimant argues that he is not asking the Court to reweigh the evidence, but to remand so that the ALJ can properly perform her duties under law. (Id. at 3.)

With regard to his knee impairment, Claimant reasserts that the ALJ did not consider significant evidence related to same, namely, the February 2016 MRI, and merely proceeding to the subsequent steps in the sequential evaluation process does not render this step two error harmless. (Id. at 4.) The ALJ had a duty to consider Claimant's non-severe impairments, including his knee impairments, when assessing the RFC. (Id.) The ALJ did not include the restriction of sitting and standing every fifteen minutes as opined by Dr. Weeks, and the Commissioner's argument that the RFC sufficiently accommodates Claimant's knee impairment is pure speculation. (Id.)

Claimant renews his request that this Court enter an order remanding this matter so that these errors may be corrected below. (Id. at 5.)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Records Related to Back Impairment:

Claimant sought treatment at Orthopædic & Spine Surgery Associates with Rajesh Patel, M.D. in June 2009 with complaints of pain in his back and legs he experienced since April 2009 as a result of lifting a tractor trailer tire and fenders all day. (Tr. at 489, 493-495.) An MRI of his lumbar spine revealed disc herniation at L5-S1 on the right side with some foraminal narrowing of the L5-S1 foramen; it was noted that there were end plate motic changes of the L5-S1 disc and mild disc bulging at L3-4 and L2-3. (Tr. at 491.) In December 2009, Claimant underwent a lumbar fusion at L5-S1. (Tr. at 476.) Post-operative x-rays showed that the fusion was in good position with no signs of hardware loosening, and Claimant had good motor strength in the lower extremities. (Id.) However, Claimant continued to have significant pain in his back and buttock area, and Dr. Patel recommended that Claimant increase his intake of Lortab to two to three times per day instead of once a day to help control his discomfort. (Id.)

Claimant returned to Dr. Patel in April 2010 and continued to complain of severe pain, with 60% of it being in his back and 40% into his leg. (Tr. at 473.) He reported taking his Lortab as recommended by Dr. Patel, and that lying down also helped alleviate his pain. (Id.) Claimant reported that physical therapy made his pain worse. (Id.)

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

Claimant returned to Dr. Patel in August 2013, complaining of neck and lower back pain that radiated into his legs; Dr. Patel noted Claimant also had severe pain in his knees. (Tr. at 466.) On physical examination, Claimant had limited lumbar range of motion, tenderness to palpation throughout his spine, and antalgic gait, but normal toe and heel walk, negative straight leg raise test, full strength (5/5) in his upper and lower extremities, intact sensation, and no muscle atrophy. (Tr. at 466-468.) In addition, an x-ray of the lumbar spine revealed a stable fusion at L5-S1 with no hardware loosening and good overall alignment. (Tr. at 468.) Dr. Patel held off on any treatment until Claimant obtained updated imaging of his lumbar spine in order to determine there were no other areas of nerve root impingement. (Tr. at 469.)

On December 11, 2013, Claimant sought emergency room treatment for headaches, dizziness and light-headedness as well as neck stiffness that began four days prior, and two weeks after being involved in a car accident where the right side of his face struck the window. (Tr. at 427-428.) A CT scan of his head was normal. (Tr. at 424.) A CT scan of his cervical spine revealed no acute fracture or dislocation and only mild degenerative disc and facet disease at C4-5 and C5-6. (Tr. at 425.) Claimant had no neurological deficits on examination. (Tr. at 427.) Claimant received a Toradol and Norflex injection for pain and discharged the same day in stable condition. (Tr. at 428.)

Claimant did not return to Dr. Patel until January 2015, when he reported he was "doing better in regard to his back" though he continued to have moderate to severe pain depending on his activities. (Tr. at 449.) On a scale of 1 to 10, Claimant rated his neck pain at a 7 and his back pain at a 5. (Id.) Claimant reported that lying down on his back for a while gave him a little bit of relief, and that his medications seem to make his pain better, though ice and physical therapy make

it worse. (Id.) A physical examination indicated that he had limited range of motion of his cervical and lumbar spine, tenderness to palpation, but normal gait, full strength (5/5) in his upper and lower extremities, negative straight leg raising test, no muscle atrophy, and intact sensation. (Tr. 449-52). Dr. Patel recommended conservative treatment and sent Claimant for a CT scan of his lumbar spine and an MRI of his cervical and lumbar spine. (Tr. at 453.) The lumbar CT scan revealed a prior fusion at L5-S1 in stable condition, moderate canal stenosis at L4-5, and moderate facet arthropathy at L2-3. (Tr. at 445.) The lumbar MRI documented disc bulge and facet disease causing mild canal stenosis at L2-3, disc herniation at L3-4 and L4-5, and a stable L5-S1 fusion. (Tr. at 447.) The cervical MRI showed disc protrusions at C3-4, C4-5, C5-6, and C6-7 with mild foraminal narrowing. (Tr. at 443.)

Claimant saw Dr. Patel for a follow up appointment on March 6, 2015, reporting ongoing back and neck pain. (Tr. at 460.) His physical examination was unchanged showing limited range of motion and tenderness to palpation in his cervical and lumbar spine, but normal gait, full strength (5/5) throughout, negative straight leg raising test, no muscle atrophy, and intact sensation. (Tr. at 460-463.) Dr. Patel noted that surgery could be an option, though they decided to try more conservative treatment measures first. (Tr. at 464.) Dr. Patel recommended that Claimant use a home traction unit for his neck, attend a course of physical therapy, and remain active and be careful about bending, twisting and lifting, with no prolonged bed rest. (Id.) Dr. Patel also referred Claimant for epidural and facet injections. (Id.) Dr. Patel opined that Claimant was currently unable to work due to pain. (Id.)

Claimant continued to complain of back and neck pain at a repeat appointment with Dr. Patel in May 2015, reporting that his lower back pain was worse than his neck pain. (Tr. at 500-

503.) Claimant stated that "everything" aggravated his pain, including walking. (Tr. at 500.) He continued to demonstrate limited range of motion in his lumbar spine, with a normal gait, tenderness to palpation, intact sensation and full motor strength in both lower extremities. (Tr. at 500-501.) Claimant subsequently underwent bilateral lumbar facet injections on May 28, 2015 that he tolerated well. (Tr. at 504-506.)

Claimant returned to Dr. Patel in January 2016. (Tr. at 555-558.) Claimant did not get much relief from the injections, but he received additional injections that day, though they did not help much with his pain. (Tr. at 555.) Claimant reported that "nothing" gives him much relief. (Id.) Dr. Patel noted Claimant continued to have limited range of motion in his spine, an antalgic gait, with abnormal heel and toe walk, tenderness to palpation, though full strength in his lower extremities, and negative straight leg raise tests. (Tr. at 555-556.) In light of Claimant's lumbar spine issues, Dr. Patel noted that it would be difficult for him to return to a medium or heavy demand job. (Tr. at 558.) Dr. Patel recommended several surgical options and sent Claimant for a repeat MRI, which documented moderate-marked lumbar spondylosis with components of multilevel disc degeneration, vertebral body lipping, facet hyperostosis, and a prior lumbar fusion. (Tr. at 592.)

In addition to treating with Dr. Patel, Claimant has also seen Lora Keaveny, D.O., his primary care physician, since at least April 2010. (Tr. at 266-279, 280-332, 337-400.) Treatment notes indicate that Dr. Keaveny prescribed Claimant Lortab for back pain; in June 2011, he reported that his pain medication was effective and without it, "he would not be able to function." (Tr. at 323.) In January 2012, Claimant indicated that Lortab, tramadol, and Flexeril were effective for his chronic lumbar pain. (Tr. at 306.) In March 2012, Claimant stated that his pain medication was effective and he rated his lumbar pain a 5 out of 10 in severity. (Tr. at 303.) Similarly, in

December 2012, he stated that his pain medication was effective for his lumbar pain, though he rated his knee pain as a 6-8 out of 10. (Tr. at 294.)

In May 2013, Claimant indicated that Lortab made his pain bearable; he rated his pain as a 3 out of 10 in severity and stated that he could perform activities of daily living. (Tr. at 286.) Although Claimant reported increased lumbar spine pain in August 2013, he reported that he had "been out of medication for about 2 weeks because his truck was broken into." (Tr. at 280.) Dr. Keaveny restarted him on Lortab and in November 2013, and Claimant reported that Lortab was effective and that he takes it three times per day, and he rated his lumbar pain a 5 out of 10 in severity. (Tr. at 405.)

He complained of increased back pain in March and June 2014, and rated his back pain as a 8 out of 10 in severity. (Tr. at 533, 536.) By September 2014, Claimant reported that his pain medication was not as effective as before; his medications were refilled without change in dosage. (Tr. at 529.) In December 2014, Claimant reported that his back pain had been stable and he felt the medication was effective. (Tr. at 525.) In May 2015, Claimant rated his back pain a 5 out of 10 in severity. (Tr. at 517.) In August and December 2015, Claimant stated that his medication was not as effective as it had been in the past, and rated his pain a 6 out of 10 in severity and stated that it was not unbearable. (Tr. at 508, 513.)

Records Related to Flatfoot Deformities:

In October 2013, Claimant saw Robert Dale Santrock, M.D., complaining of bilateral flatfoot deformity that was causing increased pain and an inability to perform all activities that he would like to. (Tr. at 403.) Although Claimant reported a lifelong history of flatfoot, his treatment to date consisted of approximately 5 sets of insoles. (Id.) On examination, he had rigid flatfoot

deformities bilaterally with valgus of the heel and flattened arch. (Tr. at 404.) Claimant had normal functioning of the Achilles, peroneal tendons, posterior tibial tendon, anterior tibial tendons, and the extensor hallucis longus (EHL) and flexor hallucis longus (FHL) tendons. (Id.) Radiographic imaging showed rigid flatfoot deformities bilaterally, subluxation of the subtalar joint, depression of the talonavicular joint, completely flattened longitudinal arch bilaterally, and hallux rigidus with arthrosis at the MTP (metatarsophalangeal) joint on the left. (Id.) Dr. Santrock assessed Claimant with bilateral rigid flatfoot and left hallux rigidus; Dr. Santrock discussed treatment options that included a triple arthrodesis, which he described as a "fairly major" surgery and has "multiple considerations including multiple complications that are possible." (Id.) However, Dr. Santrock recommended Claimant use Arizona braces should he consider foregoing surgery. (Id.)

The record indicates that Claimant did not seek any further treatment for his feet until October 2015, when he saw Blake Weeks, DPM. (Tr. at 581.) On examination, Claimant had mildly propulsive gait with no limp. (Id.) He also had lower extremity tenderness at the medial longitudinal arch, his long lateral ankle ligaments were consistent with sinus tarsi syndrome, and he had complete loss of the medial longitudinal arch. (Id.) However, Claimant had normal range of motion in his bilateral ankles with no crepitus or pain; no ankle instability of ligamentous laxity; full (5/5) muscle strength in all muscle groups of his feet; no muscle atrophy; normal muscle tone; and no neurological deficits. (Tr. at 581-582.) Dr. Weeks assessed Claimant with foot pain, pes planus of both feet, and sinus tarsi syndrome; discussed the risks and benefits of surgical intervention; and prescribed a custom orthotic brace. (Tr. at 582.)

Claimant returned to Dr. Weeks in November 2015 and January 2016 with unchanged complaints. (Tr. at 583, 585.) His physical examinations were likewise unchanged showing some

lower extremity tenderness, ligaments consistent with sinus tarsi syndrome, and bilateral pes planus deformity, but only mildly propulsive gait with either no limp or mild limp; normal ankle range of motion with no instability, crepitus, or pain; full (5/5) strength in all muscle groups of his feet; no muscle atrophy; normal muscle tone; and no neurological deficits. (Tr. at 581-584.)

Records Related to Knee Impairment:

On June 1, 2012, Claimant complained of right knee pain to his primary care provider, Dr. Keaveny. (Tr. at 299.) A physical examination showed crepitus bilaterally and Dr. Keaveny assessed him with degenerative joint disease in his knees. (Tr. at 300-301.) Subsequent treatment notes from Dr. Keaveny do not document any significant treatment for right knee pain. (Tr. at 337-390, 405-414, 508-539.) During his examinations, Claimant generally denied any muscle aches, weakness, and swelling in the extremities. (e.g., Tr. at 521, 533, 536.)

During a January 2016 appointment with Dr. Patel, Claimant complained of bilateral knee pain and swelling. (Tr. at 558.) Dr. Patel referred Claimant for an orthopedic evaluation to determine if he was a candidate for arthroscopic intervention. (Id.) An MRI taken on February 29, 2016 indicated that his right knee had grade 3-4 chondromalacia[4] of the patella, but minimal osteoarthritis. (Tr. at 596-597.)

Opinion Evidence:

On February 10, 2010, Claimant saw Dr. Patel, who opined that because the pain in his

---

[4] Claimant provides a definition of this condition for the Court's edification:

There are four grades of chondromalacia, ranging from grade 1 to 4, that designate the severity of the condition. "Grade 3 shows thinning of cartilage with active deterioration of the tissue. Grade 4, the most severe grade, indicates exposure of the bone with a significant portion of cartilage deteriorated. Bone exposure means bone-to-bone rubbing is likely occurring in the knee." Found at http://www.healthline.com/health/chondromalacia-patella. (Document No. 17 at 14, fn2.)

lower back radiated into his right leg, it "does limit him quite a bit and at this point I do not think he is healed enough to go back to his normal duties." (Tr. at 496.) Dr. Patel confirmed that Claimant should remain off work for "at least another month" and afterwards, "if he can do light duty where he can lift no more than 10 pounds and in a sedentary type position where he can sit 15 minutes and stand 15 minutes at a time, that might be an option; otherwise, I recommend he continue to stay off work." (Id.)

On January 28, 2016, Dr. Weeks completed a physical residual functional capacity questionnaire. (Tr. at 575-580.) Dr. Weeks opined that Claimant was unable to stand for "long durations at a time" due to his bilateral flatfoot deformity. (Tr. at 576.) Dr. Weeks checked boxes indicating that Claimant's symptoms would frequently be severe enough to interfere with attention and concentration; could stand less than two hours in an 8-hour workday (30 minutes at one time); and could rarely lift and carry less than 10 pounds. (Tr. at 576-578.) Dr. Weeks opined that Claimant could sit more than 2 hours at one time and about 8 hours in an 8-hour workday. (Tr. at 577.) Dr. Weeks also checked boxes indicating that Claimant could rarely twist, stoop, crouch, squat, and climb ladders or stair, but he had no limitation with reaching, handling, or fingering. (Tr. at 579.) Finally, Dr. Weeks suggested that Claimant would be absent from work more than four days per month and he was incapable of working full time at any level of exertion. (Tr. at 579-580.)

State agency expert physicians Uma Reddy, M.D. and Dominic Gaziano, M.D. reviewed the record of evidence on January 30, 2014 and June 10, 2014 respectively, and both concluded that Claimant could perform a reduced range of light work with only occasional performance of postural activities, and avoid concentrated exposure to temperature extremes, vibration, fumes,

18

odors, dusts, gases, and poor ventilation, and even moderate exposure to hazards. (Tr. at 92-94, 105-107.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he had not worked since his alleged onset date of April 12, 2013. (Tr. at 48-49.) He stated that he had gone back to work after he had a spinal fusion in 2010, but was unable to continue working. (Tr. at 49.) He stated that he had nerve damage in his legs and his feet. (Id.) He stated that his biggest problems were his back, his feet, and use of his hands due to carpal tunnel. (Tr. at 50.)

Claimant testified that he had severe pain in his lower back and down his legs and that trying to do things made his back go completely out. (Id.) He noted that sometimes if he sneezed, his back went out and then he was down. (Id.) He stated that he also had two herniated discs in his neck. (Tr. at 51.) He stated that on a typical day the pain in his lower back was about a six on a scale from one to ten. (Id.) He stated that without his medicines, his pain would be at a level ten. (Id.)

Claimant said that he had tried physical therapy that made the pain worse, that he had undergone a fusion, and that he had tried injections three or four different times. (Id.) He stated that the fusion helped a little bit in one spot, but he had several problems above the surgery site, noting that those areas were not fused or he would have been rendered completely immobile. (Id.) Claimant testified that his physician, Dr. Patel, wanted to do a laminectomy at the other for levels of his lumbar spine. (Tr. at 51-52.)

Claimant testified that "anything" worsened his back pain and gave as examples walking,

trying to bend to pick something up, and even standing in front of the sink. (Tr. at 52.) He stated

that he had tried a heating pad, but his medications were what helped him get through the day,

noting that without them he would not be able to get out of bed. (Id.) He stated that he could sit

but he had to "readjust several times" and eventually had to get up; he said he spent an average

day alternately sitting and lying. (Tr. at 52-53.) He stated that he could sit, on average, fifteen to

thirty minutes, and lay down for fifteen to thirty minutes, but he stated that he also had to get up

and move around some. (Tr. at 53.)

Claimant testified that the pain in his back radiated to both of his legs although it was worse

in the right leg. (Tr. at 54.) He stated that the pain in his legs was always there and the pain in his

right leg varied from a level four to eight on a scale of one to ten, with the average being five. (Id.)

He described the pain in his left leg as a level three. (Id.) He stated that the severity of the pain in

his legs depended on how bad his back pain was, but his knees also caused leg pain. (Tr. at 55.)

He stated that if he tried to bend it felt like a sharp knife poked his kneecap and his knee gave out,

again noting that the pain affected both knees, but that his right knee was worse. (Id.) He testified

that he had an MRI scheduled for the following Monday to assess his knees. (Id.) Claimant noted

that the pain medication he took for his back dulled his knee pain "some," but it did not help a lot

with his knees or his feet. (Id.) He rated the pain in his right knee as a three until the knife pain in

his knee occurred and then it was a level ten. (Id.) Claimant also noted that the knee pain flare-ups

could occur any time, with no precipitating activities, and they occurred daily. (Tr. at 55-56.)

Claimant testified that he had constant pain in his neck and he rated the pain level as a four

on a scale of one to ten. (Tr. at 56.) He stated that the neck pain occasionally radiated down his

arms, but not often, stating that it was mostly in his neck and down into the top of his back. (Tr. at

56-57.) He stated that if he turned his neck too far it popped and he got dizzy spells. (Tr. at 57.) He stated that his neck pain affected his ability to use his arms, like if he had to hold his arms up for a very long time, but he could use his arms to brush his teeth or something similar with no problem. (Id.)

Claimant stated that he had "awful pain" in his feet. (Id.) He stated that he could walk for ten or fifteen minutes, sit down, and within a couple of hours his ankles and feet were black from bruising. (Id.) He stated the outside of his ankles had rolled so far over that they touched the ground and he was actually walking on his ankles. (Id.) He stated that he had been advised that he could have a "triple arthrodesis" surgery where all the bones in his feet would be broken and reset, but his doctor did not recommend it due to his age. (Tr. at 57-58.) Claimant testified that his foot doctor, Dr. Weeks, had given him shoe inserts, but that made the problem worse. (Tr. at 58.) He stated that he had gotten three different opinions from doctors about his feet, one doctor did not want to touch his feet, and two doctors stated that surgery would be his only solution. (Id.)

Claimant testified that he was six feet four inches tall and weighed two hundred ninety pounds, which was his typical weight. (Tr. at 59.)

Claimant testified that he had always had some pain in his chest, had undergone several EKGs, and had high blood pressure, but about four months prior to his hearing, his doctor had advised him to undergo a stress EKG because his pain had increased and he was having shortness of breath. (Id.) He stated that he had "failed" the stress EKG. (Id.) He stated that he was having chest pain about once a week and shortness of breath any time he exerted himself. (Tr. at 59-60.)

Claimant testified that he could lift five or ten pounds without being in pain. (Tr. at 60.) He stated that he could only stand for ten minutes because his back and feet started hurting at that

point. (Id.) He stated that he could walk for fifteen minutes before he had to sit down and rest. (Tr. at 60-61.)

Claimant stated that his medications caused tiredness, but he could not sleep at night because of his pain. (Tr. at 61.) He stated that sometimes he was up all night and other nights he slept an hour or two. (Id.) He testified that he got an average of two to three hours of sleep each night. (Id.)

Claimant testified that he also had depression that was being treated with medications by his family doctors. (Id.) He stated the medications helped his symptoms "somewhat" but he still felt useless. (Id.) He stated that his depression symptoms included not wanting to get out of bed, always being upset, and feeling upset that he could not work after so many years of working long hours. (Tr. at 62.) Claimant said that he had problems remembering things and that "my head is so full of everything." (Id.) He stated that he has had problems remembering to do something his wife asked him to do or driving to the Go-Mart and forgetting what he went for. (Tr. at 62-63.)

Claimant testified that on a typical day he usually forced himself to get out of bed by 11:00 am or 12:00 noon, he then immediately took his medicine, played with the dog some, and tried to clean a little bit in the kitchen to help his wife. (Tr. at 63.) He stated that he then got to where he hurt so bad that he could not do much. (Id.) He stated that he could no longer do hobbies he had once enjoyed, such as riding a motorcycle. (Id.) He stated that he used the internet and talked to his wife and family during the day and that he made himself simple meals that did not require standing for any length of time, such as soup or sandwiches. (Tr. at 63-64.) He stated that he was able to drive and he could run into the Go-Mart to get a couple of things, but could not spend much time shopping. (Tr. at 64, 66.) He testified that he needed help with putting on his socks and tying

his shoes or boots because he could not bend over far enough to do those things. (Tr. at 64.) He stated that he could not stand at the kitchen sink to do a sink load of dishes, but he could wash up a couple of spoons or a bowl. (Tr. at 65-66.) He stated that he also sometimes took the trash out of the bathroom and dumped it into the larger trashcan and sat and folded towels. (Tr. at 66.)

William Tanzey, Vocational Expert ("VE") Testimony:

The VE testified that Claimant had a consistent work history as a heavy equipment and diesel mechanic, which is heavy, skilled work. (Tr. at 67.) The VE testified that one job Claimant had held was a combination job of mechanic and shop foreman, and he testified that a foreman job is medium, skilled work. (Tr. at 67-68.)

The ALJ asked the VE to assume an individual of the same age and with the same education and work history as Claimant, and to assume that the individual was limited to lifting ten pounds occasionally; less than ten pounds frequently; could stand and walk two hours in an eight hour day; could sit at least six hours in an eight hour day; could occasionally climb ramps and stairs; should never climb ladders, ropes, and scaffolds; could occasionally balance, stoop, kneel, crouch, crawl; and could tolerate only occasional exposure to extreme temperatures, vibrations, and hazards. (Tr. at 69.) The VE acknowledged that the individual described would be unable to perform any of his past work. (Id.) The VE testified that there were other jobs that could be performed by the individual with the limitations described, citing the jobs of security monitor, hand packer, and inspector, all of which are sedentary unskilled jobs. (Id.)

The ALJ asked the VE whether the addition of a restriction of sitting for thirty minutes at a time, standing for ten minutes at a time, and walking ten to fifteen minutes at a time would change his testimony. (Id.) The VE testified that if the individual stayed on task while standing

then those restrictions would not change his answers. (Tr. at 70.) The VE testified that if the individual were off task fifteen to twenty percent of the time during the course of the day, then there would be absolutely no jobs the individual could perform or retain. (Id.) The VE agreed that if the individual had to recline or elevate his legs in order to relieve symptoms during the day, that would take him off task. (Id.) The VE testified, also, that if the individual missed two or more days of work per month, the person could not retain employment. (Id.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

24

**Analysis**

As previously stated, Claimant argues the ALJ failed to properly evaluate the opinions of his treating sources, Dr. Patel and Dr. Weeks. (Document No. 17 at 9-13.)

The Evaluation of Opinion Evidence:

The Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 404.1527(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of

determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(c)(2).

As an initial matter, the undersigned agrees with Claimant that the ALJ explicitly assigned "only partial weight" to Dr. Patel's assessment. (Tr. at 36, 496.) However, the undersigned also agrees with the Commissioner that this opinion was not rendered on August 21, 2013 as described by the ALJ, but was in fact dated February 10, 2010, more than two years prior to the alleged onset date. Though the ALJ ultimately determined Dr. Patel's February 2010 opinion was entitled to partial credit since it was "consistent with a sedentary physical demand level", it is most problematic that Dr. Patel's opinion was given during the period the Commissioner had determined that Claimant *was disabled*, *supra*.[5] (Tr. at 36, 72-82.) Therefore, Claimant could not have been capable of even a sedentary physical demand level. Additionally, the ALJ did not consider Dr. Patel's opinion very thoroughly, he did not opine that Claimant was capable of light duty or that he was capable of sedentary type work after staying off work another month:

> "[I]f he can do light duty where he can lift no more than 10 pounds and in a sedentary type position where he can sit 15 minutes and stand 15 minutes at a time, that might be an option; *otherwise, I recommend he continue to stay off work*." (emphasis added)

In short, Dr. Patel's opinion was that Claimant continue to stay off work, an opinion ostensibly adopted by the Commissioner because Claimant was considered disabled during that time.

The Fourth Circuit has held

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to *obviously probative exhibits*, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to

---

[5] It is unclear why a significant portion of Exhibit B14F indicated an August 21, 2013 date on these treatment notes. (Tr. at 470-497.) However, after further review, it is clear what dates were the actual dates Dr. Patel saw Claimant at the Orthopædic & Spine Surgery Associates, and further, all treatment notes contained in Exhibit B14F indicate that they were "Printed On: 04/01/2015." (Tr. at 449-497.)

scrutinize the record as a whole to determine whether the conclusions reached are rational." Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984) (quoting Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977)) (emphasis added)

Accordingly, remand is appropriate under these circumstances because the ALJ's valuation of Dr. Patel's opinion is not harmless error, as this opinion was not probative evidence under the present claim. Moreover, the incongruity of the ALJ's partial credit to this opinion that Claimant could work at the sedentary level at the time the Commissioner found he was disabled is simply not "rational." Oppenheim v. Finch, 495 F.2d at 397. Accordingly, the undersigned **FINDS** the ALJ's treatment of Dr. Patel's opinion is not based on substantial evidence.

To the extent that Dr. Weeks opined that Claimant was disabled, clearly such a determination is reserved to the Commissioner, and the ALJ had no duty to give it any special significance. 20 C.F.R. § 404.1527(d)(3). Though the ALJ did not give Dr. Weeks's opinion full credit, her reasons adequately comply with the Regulations: there was a lack of "long-term treating history" because Dr. Weeks saw Claimant three times from October 21, 2015 through January 19, 2016; and Dr. Weeks did not provide explanation for his limitations. (Tr. at 36, 581-586.) In addition, the ALJ noted that Dr. Weeks found that Claimant could sit a total of eight hours in an eight-hour workday, and that he would have no significant limitations with reaching, handling, or fingering, attributes that correspond to sedentary work level. (Id.) The ALJ further noted the treatment for his bilateral foot pain consisted of orthotics, and that there were no other significant findings with respect to his flatfoot deformity. (Tr. at 35.)

Despite Dr. Weeks's opinion that Claimant's "pain or other symptoms would frequently be severe enough to interfere with attention and concentration", the ALJ noted previously that There is no evidence the claimant experiences side effects of any medication that would interfere

with his ability to perform work activity. In fact, the information in the record regarding activities of daily living indicates the claimant functions at a higher level than alleged. For example, on July 23, 2013, the claimant reported that he was working on a truck. (Tr. at 284.) The claimant indicated to Mr. Sargent that he occasionally went to the store or ran errands, and took short walks for exercise . . . . (Tr. at 436-441.)[6] In sum, the record of evidence as discussed by the ALJ did not demonstrate that Dr. Weeks's opinion was entitled to special deference treatment, and the ALJ fulfilled her obligation to provide this Court with the proper evaluation and explanation for the weight given in order for this Court to engage in meaningful review. Newhart v. Colvin, No. 6:16-cv-01606, 2014 WL 1330929 (S.D. W. Va. Mar. 31, 2014).

Accordingly, the undersigned **FINDS** that the ALJ's valuation of Dr. Weeks's opinion is based upon substantial evidence.

The Consideration of Non-Severe Impairments:

Claimant's next assignment of error concerns that the ALJ's finding his degenerative joint disease of the knees was a non-severe impairment at step two, particularly with respect to the post-hearing evidence of Claimant's grade 3-4 chondromalacia which was not mentioned by the ALJ in her step two analysis. (Document No. 17 at 13-15.) The Commissioner has pointed out that there has been no credible evidence that showed a functional loss relating to Claimant's knees, and further, Claimant failed to prove that the ALJ's step two determination prejudiced him in a way requiring remand, especially when she found other severe impairments and proceeded to the subsequent steps in the evaluation process. (Document No. 20 at 19-22.) When an adjudicator fails to list an additional impairment as severe at step two, it is not reversible error if the adjudicator

---

[6] The undersigned notes the ALJ referenced the psychological consultative examination performed on February 28, 2014.

finds at least one other severe impairment and continues with the remaining steps in the sequential evaluation process. Ashby v. Colvin, 2015 WL 1481625, at *9 (S.D.W. Va. Mar. 31, 2015).

The ALJ also reviewed the treatment notes from Claimant's primary care physician, and in particular, Dr. Keaveny noted on March 17, 2014 that Claimant "was able to do his activities of daily living with medication, and on September 23, 2014, that he reported no "exercise intolerances." (Tr. at 35.) Dr. Patel found Claimant had a normal gait, toe and heel walk on March 6, 2015, and that he "advised the claimant to remain active." (Id.) Indeed, the resulting RFC reducing Claimant to sedentary level accommodates his degenerative joint disease in his knees. The ALJ's review of Claimant's medical treatment evidence demonstrated that she considered any limitations Claimant may have had due to his knee impairment, therefore, remand on this specific issue is unnecessary.

Given the medical evidence of record up to and after the administrative hearing, it does appear that Claimant did not carry his burden in proving that his knee impairment significantly limited his ability to do basic work activities. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1512(c). However, the record before the ALJ also shows that Claimant sought treatment for his knees with Dr. Patel in January 2016, who at the time recommended that Claimant "see Dr. Whitfield for evaluation of his knees and he might be a candidate for arthroscopic intervention", and that Dr. Patel expressly stated at the time that Claimant "has tried conservative treatments without much relief and he is looking into disability measures which I think is reasonable." (Tr. at 558.) Dr. Patel also opined at the time that Claimant could not return to a medium or heavy demand job, and not only intended to order a repeat the MRI of Claimant's lumbar spine, but also to also get an functional capacity evaluation ("FCE") "[t]o answer the questions of

what he can exactly do[.]" (<u>Id</u>.)

Obviously, in January 2016, Dr. Patel was in the process of obtaining additional medical evidence in order to provide an updated opinion with regard to his long-term orthopedic patient, which would have included an opinion with respect to Claimant's knee impairment. Because the ALJ only considered Dr. Patel's pre-alleged onset date opinion, during the period the Commissioner found Claimant disabled, the undersigned **FINDS** that under the particular circumstances in this case, the ALJ did not satisfy her "duty to explore all relevant facts and inquire into the issues necessary for ***adequate*** development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986) (emphasis added). Of interest here, the <u>Cook</u> Court previously explained that an ALJ's failure to ask further questions and to demand the production of additional evidence about a claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of her duty to develop the evidence. <u>Id</u>.

In short, the undersigned **FINDS** that the evidence was in need of further development with respect to Claimant's knee impairment, and that may have changed the ALJ's assessment at step two. Though this alone does not require remand, coupled with the ALJ's partial credit to Dr. Patel's February 2010 opinion, the undersigned **FINDS** that the ALJ's decision was based on an inadequate record with respect to Claimant's knee impairment, and therefore not supported by substantial evidence.

Accordingly, the undersigned **FINDS** that the ALJ's step two assessment in finding Claimant's degenerative joint disease of the knees non-severe is not supported by substantial evidence.

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for judgment on the pleadings (Document No. 17.) to the extent that this matter be remanded back to the Commissioner, **DENY** the Defendant's request to affirm the ALJ's decision (Document No. 20.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order for the ALJ to have an adequate record of evidence in order to properly weigh Dr. Patel's opinion with regard to his assessment of Claimant's back and knee impairments.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106

S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: December 20, 2017.

Omar J. Aboulhosn
United States Magistrate Judge